## AARON GOULD *vs.* BOSTON DUCK COMPANY.

The owners of a mill, who interrupt the flow of the water of the stream on which it is built, no more than is necessary for their own reasonable and proper use of the water, consistently with the common interest of all riparian proprietors on the same stream, are not liable to an action by the owner of a mill below, for not regarding, in their use of the water, his peculiar necessities, arising from the size and character of his pond and the nature of his work, although his mill had been established, and such work carried on there, for eighty years before the building of their mill.

In estimating what is a reasonable use of water power by a millowner, usage, and the state of mechanical and manufacturing advancement, are to be considered.

An action against the owners of a mill by the owner of a lower mill on the same stream cannot be maintained on the following facts: The defendants' mill was adapted and appropriated to the size, capacity and water of the stream, and caused no further disturbance or interruption of the flow of the water to the plaintiff's mill than was necessary and unavoidable in its reasonable use for the defendants' mill, " but without reference to the plaintiff's necessities or demand for water in such periods of extraordinary drought

Gould *v.* Boston Duck Company.

as occasionally occur on this stream, when the water, though sufficient to operate the plaintiff's mill, would be insufficient to operate the defendants'; and without reference to any prescriptive or prior right of the plaintiff as the occupant of the older privilege." In seasons of drought, the defendants were obliged, in order to create the requisite head and supply of water for their mill, to shut their gates occasionally during working hours, and thus interrupted the flow of the water to the plaintiff's mill; "but this was not done wantonly, but with a reasonable regard to the best interest and advantage of the defendants as proprietors of their mill, and in conformity with the general usage of mill owners running mills on this and other similar streams;" nevertheless, "in so doing, the defendants acted wholly irrespective of the plaintiff's interests, and of his necessities or demands for water, and neither acknowledged nor conformed, wholly or in part, to any claim made by the plaintiff that a sufficient quantity should be left flowing to operate the plaintiff's mill."

ACTION OF TORT by the owner of a mill on Swift River in Palmer against the owners of another mill higher up on the same stream, for unreasonably detaining and using the water thereof, to the injury of the plaintiff's mill. The case was referred to arbitrators, and was submitted to the court upon their report, of which the following were the material parts :

"1. We find that for a period of more than one hundred years a grist mill and saw mill have been operated on the site now occupied by the plaintiff's grist mill and saw mill, on Swift River in Palmer.

"2. We find that the plaintiff purchased said mills and privilege of Emelius Bond in 1851, and that the defendants acquired their title to the lands occupied by their factory (which is situate about fifty rods above the plaintiff's dam) under a deed of warranty from said Emelius Bond, Horace Parmenter and Benjamin Leonard, dated January 1st 1836 ; that said Bond at the date of said deed was the owner of the mills and privilege now owned by the plaintiff: and that, in the deed of said Bond and others to the defendants, the grantors reserved the right to maintain the said Bond's dam, and to flow the water thereby to a certain specified height.

"3. We find that the defendants, having purchased a tract of land of one thousand acres on both sides of the stream above their said factory site, flowed the same by building a substantial dam thereon in the year 1846 ; and from the reservoir, thus created, they have drawn the necessary supply of water for their factory, through a canal running parallel with the bed of the

stream, returning however, all the water so used into the stream above the plaintiff's dam.

" 4. We find that prior to the erection of the defendants' factory, the plaintiff and his predecessors had been accustomed to run their saw and grist mill sometimes by night, and out of the usual working hours, as well as by day and in regular working hours; but we find that at no particular seasons or periods were they accustomed to run said mills out of working hours, and only as the occasional pressure of business might demand; and we find that they had followed this practice more than twenty years prior to the erection of the defendants' factory, or to the sale of said factory site by said Bond and others to the defendants.

" 5. We find that the defendants completed and commenced running their factory in 1848, and their entire works, operated on said canal, were of about two hundred and fifty horse power; but we find that said works were of such magnitude only as were adapted and appropriate to the size and capacity of said stream and to the quantity of water usually flowing therein. But in our judgment as to said adaptation and suitableness of said works to said stream we have had reference to the ordinary volume and flow of water at different seasons; but no reference to the plaintiff's necessities or demand for water in such periods of extraordinary and extreme drought as occasionally occur on this stream, when the water, though sufficient to operate the plaintiff's mills, would be insufficient to operate the defendants' factory; nor had we reference to any prescriptive or prior right in the plaintiff as the occupant of the older privilege.

" 6. We find that the defendants have caused no further disturbance or interruption of the flow of water to the plaintiff's mills, than was necessary and unavoidable in and by the reasonable and proper use of it for the propelling and working of the defendants' factory. But in estimating such reasonable and proper use we have had no regard to the plaintiff's necessities or demands for water at such seasons of extraordinary and extreme drought as occasionally occur on this stream, when the

water, though sufficient to operate the plaintiff's mills, would be insufficient to operate the defendants' factory; nor had we reference to any prescriptive or prior right in the plaintiff as the occupant of an older privilege.

" 7. We find that during the season of greatest drought in the years of 1851, 1852, 1853 and 1854, the defendants were not able to operate their factory throughout the usual working hours of each working day, but were obliged, in order to create the requisite head and supply of water for their own works, to shut their gates earlier than usual on some days, and sometimes for a whole day at once; but this was not done wantonly, but was done with a reasonable regard to the best interests and advantage of the defendants as proprietors of said factory, and in conformity with the general usage of millowners running mills on this and other similar streams. But we further find that in so doing the defendants acted wholly irrespective of the plaintiff's interests, and of his necessities or demands for water, and neither acknowledged nor conformed wholly or in part to any claim made by the plaintiff that a sufficient quantity should be left flowing to operate the plaintiff's mills.

" 8. We find that the number of working hours lost to the plaintiff by thus shutting the defendants' gates in order to replenish their pond, would, during the period sued for, viz.: from the 1st of June 1851 to the 16th of February 1857, in the aggregate, amount to an average of eight and a half days in each of the years 1851, 1852, 1853 and 1854; while in the years 1855, 1856 and 1857 it did not appear there was any loss of working time or hindrance to the plaintiff's mills or to the defendants' factory from drought, or any cause imputable to the defendants. And we further find that the above proportion of working time lost is less than the time usually lost each year by similar mills and manufacturing establishments on this and other similar streams from drought.

" 9. We find that the plaintiff's mills require less than half the supply of water necessary for operating the defendant's factory, and that during the dry season aforesaid the plaintiff might nave run his mills, or one of them, during working hours, had

not the defendants, by shutting their gates, stopped the supply of water during a portion of the usual working hours as aforesaid ; and we find also that in each dry season as aforesaid, as well as at other times, the defendants have discharged through their wheels at least double the quantity of water necessary for operating the plaintiff's mills, and that the surplus so discharged flowed over the plaintiff's dam, and was of no use or benefit to the plaintiff. But we find that the defendants could not have run their factory, so as to have afforded a supply graduated to the wants of the plaintiff, without serious detriment to their own interests, much greater than is sustained by the plaintiff from the causes complained of.

" 10. Whether upon the foregoing findings of fact it was the duty of the defendants, in point of law, to leave their gates or any of them so far open that a supply of water would flow to the plaintiff's mills during all of working hours in each dry season, or during any part of such hours as the defendants, having a reasonable but exclusive regard to their own necessities, were obliged to stop their works, we refer to the consideration of the court ; and if it was any part of the reasonable duty of the defendants to consider the plaintiff's necessities and demands for water during regular working hours, or to consider and observe any prescriptive or prior right in the plaintiff thereto, and in any respect to conform to the same by furnishing him with water at the time, or during any part of the time, when their own necessities required them to shut their gates, we find for the plaintiff, and award as damages for the detention of water during the years aforesaid (but for no other cause) the sum of three hundred and eighteen dollars. Furthermore, if it was any part of the defendants' reasonable duty to furnish a supply of water to the plaintiff out of the usual working hours, to enable him to run his mills as he had been occasionally accustomed to run them, at irregular and unusual hours, then we further find on this ground nominal damages and assess the same at one dollar. If on neither of the grounds or for neither of the causes above set forth the plaintiff is entitled to recover, we find for the defendants."

*E. W. Bond,* for the plaintiff. 1. By the report of the referees, the plaintiff is entitled to recover damages to the amount of three hundred and eighteen dollars, if it was any part of the defendants' duty to observe any prescriptive or prior right of the plaintiff to have sufficient water flow during regular working hours to operate his saw mill and grist mill.

The plaintiff had such prescriptive right; as the report finds that for more than one hundred years a saw mill and grist mill have been accustomed to be run by the plaintiff and his predecessors, during regular working hours, on the site now occupied by the plaintiff's mills. It was the duty of the defendants, whose dam was not built till 1846, to observe this prescriptive right; instead of which they shut their gates, whenever their own convenience and interests dictated, so as to occasion a loss to the plaintiff of an average of eight and a half working days annually for four years. Angell on Watercourses, § 230. *Cary* v. *Daniels,* 8 Met. 479. *Hodges* v. *Raymond,* 9 Mass. 316. *Pitts* v. *Lancaster Mills,* 13 Met. 156. *Bigelow* v. *Newell,* 10 Pick. 348. *Bolivar Manuf. Co.* v. *Neponset Manuf. Co.* 16 Pick. 241. *Elliot* v. *Fitchburg Railroad,* 10 Cush. 196. *Thurber* v. *Martin,* 2 Gray, 394. *Wentworth* v. *Poor,* 38 Maine, 243. *Balston* v. *Bensted,* 1 Campb. 463. *Mason* v. *Hill,* 3 B. & Ad. 304. 3 Kent Com. (6th ed.) 441, 442.

2. Priority of occupation, of itself, secures to the first occupant the exclusive right to the use of the water, to the extent of his occupation. *Cary* v. *Daniels,* 8 Met. 477. *Thurber* v. *Martin,* 2 Gray, 394. *Wentworth* v. *Poor,* 38 Maine, 243. The report finds that during all the periods of interruption complained of, the quantity of water flowing in the river was necessary and sufficient (but for the defendants' use) to operate the plaintiff's mills during regular working hours, as he had been accustomed to use the water.

The prescriptive or prior rights of the plaintiff were not an easement, liable to be extinguished by unity of ownership; but were parcel of the estate, and remained with it, unless expressly conveyed to the defendants. *Cary* v. *Daniels,* 8 Met. 480. Moreover, there never was any unity of possession; for Bond

alone owned the plaintiff's premises ; and the defendants' premises in common with Parmenter and Leonard.   And the reservation in their deed to the defendants shows the intention to leave the rights of the parties as they were before.

3. The report finds that the plaintiff is entitled to recover damages to the amount of three hundred and eighteen dollars, if in determining the suitableness of the defendants' mill to the stream, or in determining whether the defendants made a reasonable and proper use of the water, regard should be had not merely to the ordinary volume and flow of water, and to the defendants' wants and circumstances, but to the quantity of water, and to the plaintiff's necessities for water in such seasons of drought as occasionally occur on this stream, when the water, though sufficient to operate the plaintiff's mills, would be insufficient to operate the defendants' factory.   And it expressly appears that in shutting their gates earlier than usual some days, and sometimes for a whole day, the defendants had regard only to their own interests and advantage, and acted wholly irrespective of the plaintiff's interests and necessities, and entirely disregarded his claim, that enough water should be left flowing to operate his mills. ' The defendants are therefore liable. 3 Kent Com. 440. *Anthony* v. *Lapham*, 5 Pick. 175. *Barrett* v. *Parsons*, 10 Cush. 367.   *Sampson* v. *Hoddinott*, 1 C. B. (N. S.) 590.   *Mason* v. *Hill*, 3 B. & Ad. 304.

Nothing short of a prescriptive right could justify the defendants in such a course as they pursued; and no such right is claimed by them.

The facts, that in shutting their gates during working hours in dry seasons, the defendants acted in conformity to the general usage of mill owners, on this and similar streams, and that the proportion of working time lost by the plaintiff was less than that usually lost by similar mills on this and other streams, from drought, cannot affect the plaintiff's right to recover.

4. The defendants are clearly liable to the plaintiff, for discharging the water, after filling their pond, so that half of it ran to waste and was lost by the plaintiff. *Thurber* v. *Martin*, 2 Gray, 395.   Angell on Watercourses, § 115.

The fact, that if the defendants had graduated the supply of water according to the plaintiff's wants, they would have sus-tained a greater damage than the plaintiff suffered from having his supply cut off, cannot affect his right to recover.

5. The plaintiff is entitled to recover the nominal damages mentioned in the report, because, for more than twenty years before the defendants bought their site, the plaintiff and his pre-decessors had run their saw and grist mills, sometimes by night and out of usual working hours, though at no particular sea-sons or periods, and only as the occasional pressure of business required.

*R. A. Chapman*, for the defendants, cited *Cary* v. *Daniels*, 8 Met. 476, 477 ; *Pitts* v. *Lancaster Mills*, 13 Met. 156 ; *Barrett* v. *Parsons*, 10 Cush. 367 ; *Thurber* v. *Martin*, 2 Gray, 394; *Wolcott Woollen Manuf. Co.* v. *Upham*, 5 Pick. 292 ; *Shaw* v. *Wells*, 5 Cush. 537 ; *Rockwood* v. *Wilson*, 11 Cush. 221 ; *Gould* v. *Bugbee*, 6 Gray, 371; *Blyth* v. *Birmingham Waterworks*, 11 Exch. 781 ; *Wood* v. *Waud*, 3 Exch. 780 ; *Embrey* v. *Owen*, 6 Exch. 368.

SHAW, C. J.   This is an action of tort, to recover damage, done to the plaintiff, in the use of his mills, situated on Swift River, so called, by the defendants, in erecting on their own land on the same river, and above the mills of the plaintiff, mills and manufactories of greater magnitude than were adapted and appropriate to the size and capacity of said river, and to the quantity of water flowing therein, and using the water of said river in an unreasonable manner, and detaining the same in a pond or reservoir, for unreasonable periods of time, both in the day and night, and discharging the same in excessive quantities, so that much of it ran to waste and was lost to the plaintiff, de-priving him of the water power.

This case having been submitted to referees, by rule of court, their report, by agreement of parties, is now to be taken as a statement of facts.   It involves the relative rights of riparian proprietors on the same stream or watercourse, as it passes through their respective lands, to the use of the power of such current, for hydraulic purposes.   These rights depend mainly

38 *

upon the rules and principles of the common law, somewhat altered and modified by the series of enactments known as the mill acts of Massachusetts. This rule is, that every proprietor of land through which a watercourse runs has a right to the use of the impelling force of the current, or what is more familiarly called the head and fall of the current, for mill purposes, so far as they exist on his own land, if there be any such head and fall within his own limits. If the water flows at nearly a level, there will be no such available head and fall. If the descent be very rapid, there will be such head and fall, and of course mill sites or privileges, at short distances from each other. If the descent be gentle and regular, and the land of a proprietor not extensive, the head and fall on his own land may be quite insufficient for practical use, for mill purposes. This latter consideration probably led to an early modification of the common law in Massachusetts, by a provision that such a proprietor might erect a dam on his own land and raise a head of water to his own best advantage, although it might raise the water in the bed of the river, beyond and above the limits of his own land; notwithstanding it might flow back, by such rise in the bed of the river, upon the land of other proprietors — with a provision for a compensation in damages.

These provisions have effected a change in the common law to this extent: By the common law, the rights of each successive riparian proprietor to the reasonable use of the mill power of the stream are equal; each has a right to a reasonable use of it as it passes through his own land only, with a right incident thereto to erect such dams, canals, sluices and water ways, as to fit it for the actual working of mills. By the right given by the mill acts to any proprietor to flow back beyond his own limits, the common law is changed to some extent. Before any mills are erected, the right of each proprietor is the same; it is a right to appropriate the power of the stream, by the actual erection of a mill, though the head and fall within the limits of his own land are insufficient, and, in order to get sufficient head he raises his dam so as to flow beyond his own limits. The necessary consequence is, that when one proprietor, under

the common right, has in fact appropriated the power, the proprietor below is so far restricted in his right of appropriation, that he cannot erect a mill on his own land, and flow back the water, to the destruction of the mill already erected by authority of law. This priority of first possession necessarily arises from the nature of appropriation; where two or more men have an equal right to appropriate, and where the actual appropriation by one necessarily excludes all others, the first in time is the first in right. *Cary* v. *Daniels*, 8 Met. 466.

By the rule that all proprietors of land through which a watercourse passes have an equal right to the use of the power of the stream for mill purposes, it is not to be understood that each or any one has a right to the natural flow of the stream in the manner in which it ran originally, or as it would run if no mill were erected on it, or to be worked by it; in its mere natural flow, it affords no power. Dams must be made to raise it, and canals and sluices to conduct, apply and discharge it. The right to erect these works, and to change the natural mode of the flow of the current, is incident to the right of applying it to the working of mills, and this right therefore is common to every riparian proprietor. Each therefore must exercise his own reasonable right with a just regard to the like reasonable use by all others. The mere erection of a dam, and the use of the water in driving wheels, must necessarily derange its steady and constant natural flow, and substitute a different manner, as to the time and mode of holding it up and letting it down. So far as such mode is reasonably incidental to the use of the stream for mill purposes, it is the right of the proprietor, and constitutes, in part, the mill privilege which the law gives him.

In examining the facts in the present case, the court are of opinion that the plaintiff acquired no prior right, by prescription or otherwise, to any particular mode of using the water. It must be some use inconsistent with, and therefore adverse to the right of others, which can be acquired by prescription, such as diverting the water from its natural course. So far as he uses it equally, and in a manner consistent with the equal and common right of others, he makes no adverse use, and ac-

quires no right adverse to theirs. It appears that the plaintiff had a great abundance of water, beyond what was necessary for working his own mills, and could work them day or night, without encroaching on the right of any other, above or below.

We are also of opinion, that nothing stated in the facts, as to the manner in which the parties respectively acquired their rights to their respective estates, affects the right of either against the other, as millowners; but that the rights of the parties respectively, as owners of mills, must depend upon the rules of law, regulating the rights of riparian owners, as established in this commonwealth.

Upon the facts agreed, the court are of opinion, that the defendants did not exceed their just right in the use of this water power.

It appears that the defendants built a substantial dam across the river, that the water was drawn into their manufactory by a canal, and, after being run upon their wheels, was wholly returned to the bed of the stream above the plaintiff's mills; and that the works of the defendants "were of such magnitude only as were adapted to the size and capacity of the stream and to the quantity of water usually flowing therein." It also appears that "the defendants have caused no further disturbance or interruption of the flow of water to the plaintiff's mills, than was necessary and unavoidable in and by the reasonable and proper use of it, for the propelling and working of the defendants' factory." What is a reasonable use of water power may often be a difficult question, depending upon a great variety of circumstances; somewhat upon usage, upon the state of mechanical and manufacturing advancement. Usage is some proof of what is considered a reasonable and proper use of that which is a common right; because it affords evidence of the tacit consent of all parties interested, to the general convenience of such use. The circumstances above stated, we think, are decisive of the present case, and show that the defendants made no other than a reasonable use of the water; and if this did interfere at times, with the use which the plaintiff might have made of the water

if the defendants had had no occasion to use it, it was *damnum absque injuria.*

But the referees who report these facts further say, that in making their estimate of the suitableness of the works to the stream, they "have had reference to the ordinary volume and flow of the water, at different seasons; but no reference to the plaintiff's necessities for water in times of extraordinary and extreme drought, when the stream, though sufficient to operate the plaintiff's mills, would be insufficient to operate the defendants' factory." By this we understand that they did not take into consideration the plaintiff's necessities, arising from his peculiar business, the height of his pond, the capacity of his reservoir and the nature and character of his works. One of the grounds of the plaintiff's complaint was, that when the water was very low, in time of drought, and the defendants detained it a few hours, or in one instance a whole day, to raise the water to a sufficient height to work their own factory, it came to the plaintiff's mill faster than he could use it, and ran to waste over his dam. If it was so, it was because he had works not adapted to the entire or the best use of the stream; because his dam was too low, his reservoir not of sufficient capacity, or other cause, by which he was prevented from making the best use of the power of the water, when very low by reason of drought. If there was a loss of water at such times and from such cause, it was not one for which the defendants were responsible.

As there was no detention of the water in ordinary stages of water, and no other detention of the water by the defendants, in times of extreme drought, than what was necessary to the reasonable use of their own mills, we are of opinion that it was not their duty, in point of law, to open their gates, or leave them open without using the amount to such extent as they might, merely because the plaintiff's works were of such a char acter that his necessities required such flow of the water.

*Judgment for the defendants*